

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-1997

# Saroop v. Garcia

Precedential or Non-Precedential:

Docket 96-7196

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Saroop v. Garcia" (1997). *1997 Decisions.* Paper 67.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/67

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 96-7196
_____


U.S.A. EX REL: LOLITA SAROOP

v.

JESUS A. GARCIA

Lolita Saroop,
Appellant


_____

On Appeal from the District Court of the Virgin Islands
Division of St. Croix
(D.C. Civil Action No. 96-cv-00006)
_____


Argued December 13, 1996

Before:  SCIRICA, NYGAARD and McKEE, Circuit Judges

(Filed March 21, 1997)


MELODY M. WALCOTT, ESQUIRE (ARGUED)
Office of the Federal Public Defender
P.O. Box 3450
Christiansted, St. Croix
U.S. Virgin Islands 00822

  Attorney for Appellant

MICHAEL A. HUMPHREYS, ESQUIRE (ARGUED)
Office of the United States Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
U.S. Virgin Islands 00820

  Attorney for Appellee

---
OPINION OF THE COURT
---

SCIRICA, <u>Circuit Judge</u>.

The issue on appeal in this <u>habeas corpus</u> case is the validity of the extradition treaty between the United States and Trinidad and Tobago. The district court found there was a valid treaty permitting extradition. We will affirm.

**I.**

In 1991, Lolita Saroop, a citizen of Trinidad and Tobago, was indicted in the United States Virgin Islands for drug trafficking and conspiracy.[1] She was charged with supplying and packaging illegal drugs for a conspiracy based in St. Croix and profiting from their sale.[2]

---

1. The Indictment contained four counts:

(1) Conspiracy to unlawfully possess, import and distribute, and possess aboard an aircraft arriving in the United States, quantities of controlled substances, including cocaine and cocaine base in violation of 21 U.S.C. §§ 846, 963;

(2) Attempt to unlawfully import into the United States a Scheduled II controlled substance in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a), 960(a)(1), 963;

(3) Unlawfully possessing and bringing on board an aircraft arriving in the United States a Scheduled II controlled substance which was not a part of the aircraft's manifest in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 955, 960(a)(1); and

(4) Attempt to possess with the intent to distribute a Scheduled II controlled substance in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 841(a)(1), 846.

2. In 1991, Burrell Gill, a co-conspirator, was convicted on these charges in the Virgin Islands. <u>United States v. Gill</u>, 968 F.2d 14 (3d Cir.), <u>cert. denied</u>, 506 U.S. 963 (1992).

Citing a 1931 treaty between the United States and Great Britain, the United States sought her extradition.[3] Saroop claimed the 1931 United States–Great Britain treaty was never ratified by the independent nation of Trinidad and Tobago. An invalid treaty, she argued, could not support her extradition. But the Trinidad and Tobago courts found the treaty valid and refused to quash the extradition arrest warrant. In 1995, the government of Trinidad and Tobago surrendered Saroop to the United States Marshal for transfer to St. Croix.

While awaiting trial in the United States Virgin Islands, Saroop filed a petition in absentia with the Privy Council for leave to appeal from the judgment of the High Court of Justice of Trinidad and Tobago. The Privy Council is the court of last resort in the British Commonwealth of which Trinidad and Tobago is a participating member. This legal structure survived Trinidad and Tobago's independence from Great Britain. The Privy Council denied her petition without a hearing.

In 1996, Saroop filed a habeas corpus petition under 28 U.S.C. § 2255 in the District Court for the Virgin Islands raising the same argument rejected by Trinidad and Tobago – that her extradition was unlawful because there was no valid extradition treaty. Finding a valid treaty between the two

---

3. Extradition is defined as "the process by which a person charged with or convicted of a crime under the law of one state is arrested in another state and returned for trial or punishment." Restatement (Third) of The Foreign Relations Law of the United States § 474, pt. IV.

3

nations, the district court denied her petition. This appeal followed.[4]

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review legal conclusions on a plenary basis and factual findings for clear error. Yohn v. Love, 76 F.3d 508, 515 (3d Cir. 1996); United States ex rel. Schiano v. Luther, 954 F.2d 910, 911 (3d Cir. 1992). Interpretations of foreign law are subject to plenary review and may be resolved by reference to any relevant information. Grupo Protexa S.A. v. All American Marine Slip, a Div. of Marine Office of America Corp., 20 F.3d 1224, 1239 (3d Cir.), cert. denied, 115 S. Ct. 481 (1994); Kilbarr Corp. v. Business Sys. Inc., B.V., 990 F.2d 83, 87–88 (3d Cir. 1993); Mobile Marine Sales, Ltd. v. M/V Prodromos, 776 F.2d 85, 89 (3d Cir. 1985); Fed. R. Civ. P. 44.1.

---

4. Saroop is still in custody in MDC Guaynabo, Puerto Rico, awaiting trial. The district court stayed the criminal proceedings pending appeal.

**III.**

Because treaties are agreements between nations, individuals ordinarily may not challenge treaty interpretations in the absence of an express provision within the treaty or an action brought by a signatory nation. Although the district court found Saroop had standing, the government contends only Trinidad and Tobago had standing to sue.[5] See United States v. Riviere, 924 F.2d 1289, 1298-1301 (3d Cir. 1991) ("Dominica has exercised its power to surrender Riviere as a matter of comity for charges not listed in the extradition order; Riviere has no basis for objection to its actions."); Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir.), cert. denied, 498 U.S. 878 (1990) ("Treaties are designed to protect the sovereign interest of nations, and it is up to the offended nations to determine whether a violation of sovereign interests has occurred and requires redress"); United States v. Diwan, 864 F.2d 715, 721 (11th Cir.), cert. denied, 492 U.S. 921 (1989); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.), cert. denied, 479 U.S. 1009 (1986).

Had Saroop brought suit invoking the treaty or the Rule of Specialty, she would lack standing.[6] United States v.

5. Although not directly raised on appeal, the government has asked us to revisit it. Because standing was argued before the district court we will address it.

6. "The rule of specialty is based on principles of international comity and is designed to guarantee the surrendering nation that the extradited individual will not be subject to indiscriminate prosecution by the receiving government." Leighnor v. Turner, 884 F.2d 385, 389 (8th Cir. 1989); see Fiocconi v. Attorney General of United States, 462 F.2d 475, 481 (2d Cir.), cert. denied, 409 U.S. 1059 (1972);

5

<u>Riviere</u>, 924 F.2d 1289, 1300-1301 (3d Cir. 1991); <u>Matta-Ballesteros v. Henman</u>, 896 F.2d 255, 259 (7th Cir.), <u>cert. denied</u>, 498 U.S. 878 (1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved."); <u>United States v. Cordero</u>, 668 F.2d 32, 37 (1st Cir. 1981). But Saroop does not invoke the terms of the treaty to avoid extradition. Instead, she asserts the treaty is invalid.

For this reason, we believe the government's reliance on <u>United States v. Riviere</u>, 924 F.2d 1289 (3d Cir. 1991), is misplaced. In <u>Riviere</u>, the petitioner contended his extradition from Dominica on drug charges violated the extradition treaty between the United States and Dominica and the Rule of Specialty, and barred his prosecution for firearms offenses. Because the extradition agreement runs between sovereigns, not individuals, and because Dominica consented to extradition, we held Riviere lacked standing. Riviere's rights to challenge extradition were "derivative." Rather than invoking derivative rights, Saroop maintains there was no extradition treaty between the United States and Trinidad and Tobago. Where the validity of the extradition treaty itself has been challenged, a petitioner like Saroop has standing.

**IV.**

(..continued)
Bassiouni, International Extradition: United States Law and Practice, vol. 1, ch. 7, p. 359-60 (2d rev. ed. 1987). Saroop has not set forth a specialty challenge to her extradition.

6

In 1931, the United States entered into an extradition treaty with Great Britain.  In 1935, Great Britain adopted an Order in Council[7] that provided:

> From and after the 24th day of June 1935, the Extradition Acts 1870-1932 shall apply in respect of the United Kingdom of Great Britain and Northern Ireland, the Channel Islands, the Isle of Man, and all British Colonies in the case of the United States of America under and in accordance with the said treaty of the 22nd December 1931.

The 1931 treaty, therefore, defined the United States' relationship with Trinidad and Tobago, at the time a colony of Great Britain.

On August 31, 1962, Trinidad and Tobago became an independent dominion of Great Britain under the Order in Council of 1962 and the Trinidad and Tobago Independence Act 1962.  On August 1, 1976, Trinidad and Tobago's dominion status ceased by virtue of the Constitution of Trinidad and Tobago Act 1976.  Thereafter, Trinidad and Tobago became an independent republic.

Saroop contends there was no valid extradition treaty with the United States because Trinidad and Tobago was neither a named party to the original 1931 extradition treaty nor did it ratify or expressly adopt it.  The government proffers two

---

7.  "The Sovereign of the United Kingdom has inherent power to legislate or issue executive instructions by exercise of the Royal Prerogative. . . .  An Order of Her Majesty in Council is made with the advice of the Privy Council, and signed by the Clerk of the Council.  An Order in Council is nearly always used in establishing the Constitution of a Dependent Territory.  They are also used for ordinary legislation or for extending particular Acts of the United Kingdom Parliament to the dependent territories."  3 Guy W. Lewin Smith, Modern Legal Systems Cyclopedia 3.260.6, § 1.1(B)(4) (Kenneth Robert Redden ed., William S. Hein & Co. 1990).  Trinidad and Tobago was considered a "Dependent Territory" before it became an independent republic.

7

arguments in support of a valid treaty – deferral to the judgment of the High Court of Justice of Trinidad and Tobago under the international principle of comity and deferral to the understanding of each sovereign's executive branch as evidenced by their actions and pronouncements. On either ground, the district court found that Saroop was properly extradited.

**A**

Saroop presented her arguments against extradition in the courts of Trinidad and Tobago. At each level, the courts found her claim meritless. The High Court of Justice found no ground to bar Saroop's extradition under the 1931 extradition treaty between the United States and Great Britain. The High Court wrote:

By Section 4 of [the 1962 Act], the [Extradition] Act qualified as one of the existing laws of the Colony of Trinidad and Tobago immediately before the commencement of [the 1962 Act]. It was consequently preserved by the provisions of that section as part of the law of the independent Dominion of Trinidad and Tobago. . . . But all existing laws then in force [prior to 1976] in the independent Dominion of Trinidad and Tobago were preserved as part of the law of the Republic by Section 4 of the 1976 Act so that the [Extradition] Act continued its life thereafter as part of the law of the Republic.

In the Matter of Itmo Lolita Saroop, H.C.A. No. 3040, at 5-6 (High Court of Justice Nov. 29, 1993). The High Court expressly held the 1931 treaty was incorporated into the law of the independent nation of Trinidad and Tobago and was still binding.

Under the international principle of comity this judgment is entitled to recognition. The Supreme Court has defined comity as:

8

neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens, or of other persons who are under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 163-64 (1895); see also Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A., 44 F.3d 187, 191 (3d Cir. 1994)("Under the principle of international comity, a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation.")(quoting from Remington Rand Corporation-Delaware v. Business Sys. Inc., 830 F.2d 1260, 1266 (3d Cir. 1987)). Such deference "fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." Spatola v. United States, 925 F.2d 615, 618 (2d Cir. 1991) (quoting from Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984)).

While the comity doctrine does not reach the force of obligation, it creates a strong presumption in favor of recognizing foreign judicial decrees.[8] See Republic of Philippines v. Westinghouse Electric Corp., 43 F.3d 65, 75 (3d Cir. 1994); Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995).

8. We note as to foreign judgments in particular, the Restatement provides: "[A] final judgment of a court of a foreign state . . . establishing or confirming the status of a person . . . is conclusive between the parties, and is entitled to recognition in courts in the United States." Restatement (Third) of The Foreign Relations of The United States § 481 (1986).

The decision to defer to a foreign judgment falls within the sound discretion of the trial judge and comity should be avoided only when it would be detrimental or prejudicial to the interests of the United States. See Philadelphia Gear Corp., 44 F.3d at 191; Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971), cert. denied, 405 U.S. 1017 (1972).

But the Supreme Court has required that certain criteria be satisfied before a court of the United States recognizes a foreign nation's judgment.  The Court said:

[W]e are satisfied that where there has been opportunity for a full and fair trial abroad [1] before a court of competent jurisdiction, [2] conducting the trial upon regular proceedings, [3] after due citation or voluntary appearance of defendant, [4] and under a system of jurisprudence likely to secure an impartial administration of justice . . ., [5] and there is nothing to show either prejudice in the court, . . . or fraud in procuring the judgment . . . the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal . . . .

Hilton v. Guyot, 159 U.S. at 202-203.  As a condition to honoring a foreign country's judicial decrees, the Court also requires reciprocity on the part of the foreign nation.  Id. at 210.

Saroop does not contend her judicial proceedings in Trinidad and Tobago violated the strictures set forth in Hilton v. Guyot.  Nor from our review of the record, does there appear to be any basis for such a challenge.  Saroop, a Trinidadian citizen, chose to file her action in Trinidad and Tobago.  There is no assertion that Trinidad and Tobago failed to follow its own regular judicial proceedings, engaged in prejudicial or fraudulent practices, or refused to extend deference to United

10

States' judicial findings.  See In the Matter of Itmo Lolita Saroop, H.C.A. No. 3040 (High Court of Justice  Nov. 29 1993).

In support of her argument to ignore the High Court's judgment and the international principle of comity, Saroop cites a 106 year old district court decision, Ex Parte McCabe, 46 F. 363 (W.D. Tex. 1891).  But this case is inapposite.  In Ex Parte McCabe the district court held his extradition improper under principles of comity because of a clear treaty provision and past United States' practice precluding the extradition of an American citizen to Mexico.  Here, there is no treaty provision or past practice which precludes reliance on the Trinidad and Tobago courts' judgment.

Extension of comity will not prejudice the interests of the United States.  Rather it furthers those interests because the United States recognizes the 1931 treaty as binding itself and Trinidad and Tobago.  Under the doctrine of international comity, we will defer to the judgment of the High Court of Justice for Trinidad and Tobago on the validity of the 1931 extradition treaty and its continued vitality at the time of Saroop's extradition.  Therefore, we hold there was a valid extradition treaty at the time of Saroop's surrender.

**B**

In the alternative, the district court held there was an enforceable agreement between the governments of the United States and Trinidad and Tobago based on their intent and actions.  When determining whether two nations have entered into an extradition treaty, courts usually defer to the intentions and

11

actions of each nation's executive branch.  See Terlinden v. Ames, 184 U.S. 270, 290 (1902).

In Terlinden, the Imperial German Consul filed a complaint before a United States Commissioner requesting a warrant for the arrest and surrender of Gerhard Terlinden, a subject of the former Kingdom of Prussia and a fugitive from the German Empire, for forgery and counterfeiting.  In 1852, the United States entered into an extradition treaty with the Kingdom of Prussia which sanctioned the surrender of fugitives for the crime of forgery.  In 1871, the Kingdom of Prussia was subsumed into the newly formed German Empire.  Terlinden filed a habeas corpus petition in federal court asserting there was no treaty between the United States and the German Empire which sanctioned the extradition of fugitives, and the extradition treaty between the United States and the former Kingdom of Prussia was terminated by operation of law after the incorporation of Prussia into the German Empire.

The Supreme Court examined whether the United States and Germany acted in accordance with the understanding that the 1852 treaty was still in effect.  "[O]n the question whether [the extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance."  Terlinden 184 U.S. at 285.  It was "out of the question" that a Prussian fugitive could sue in the United States' courts to challenge the executive departments' conclusion that the treaty obligations between the two nations survived the German Empire's absorption of the Prussian Kingdom.  Id. at 286.  The Court held:

12

We concur in the view that the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard. . . .  The decisions of the Executive Department in matters of extradition, within its own sphere, and in accordance with the Constitution, are not open to judicial revision . . . ."

Terlinden, 184 U.S. at 288, 290; see also Charlton v. Kelly, 229 U.S. 447, 474-475 (1913).

Whether a treaty remains in force after a change in the sovereign status of one of the signatories has been treated by other Courts of Appeals as a political question better left to the executive branch of government.  Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996) ("The continuing validity of the Treaty after Singapore's independence from the United Kingdom presents a political question, and we must defer to the intentions of the State Departments of the two countries."); New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc., 954 F.2d 847, 852 (2d Cir.) ("'It is well settled that on the question whether [a] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance.' [citations omitted].  Moreover, the judiciary should refrain from determining whether a treaty has lapsed, and instead should defer to the wishes of the elected branches of government." (quoting from Terlinden, 184 U.S. at 285)), cert. denied, 506 U.S. 827 (1992); Matter of Extradition of Tuttle, 966 F.2d 1316 (9th Cir. 1992) (citing Terlinden with approval); Sabatier v. Dabrowski, 586 F.2d 866, 868 (1st Cir. 1978) (the court must give "great"

deference to the conduct of the two countries when deciding a treaty's applicability).

We will look to the intent and actions of Trinidad and Tobago and the United States to ascertain if there was a valid treaty. The nations' conduct proves dispositive. Terlinden 184 U.S. at 285; New York Chinese TV Programs, Inc. 954 F.2d at 852; Sabatier, 586 F.2d at 868.[9]

We recognize there has been no express confirmation of an extradition treaty between the United States and the independent nation of Trinidad and Tobago. Nor has there been an exchange of diplomatic letters between the two nations expressly placing Trinidad and Tobago under the 1931 treaty. But Trinidad and Tobago clearly believes, as demonstrated through its legislative mandates, there is a valid extradition treaty which sanctioned its surrender of Saroop to the American authorities.

---

9.  The Vienna Convention of Succession of States in Respect of Treaties provides:

A bilateral treaty which at the date of a succession of States was in force in respect of the territory to which the succession of States relates is considered as being in force between a newly independent State and the other State party when:
(a) they expressly so agree; or
**(b) by reason of their conduct they are to be considered as having so agreed.**

United Nations Convention on the Succession of States in Respect of Treaties, (Article 24) Vienna, Austria, August 23, 1978 (emphasis supplied). The United States is a party to the Vienna Convention and is consequentially bound by its obligations. See 767 Third Avenue Associates v. Permanent Mission of the Republic of Zaire to United Nations, 988 F.2d 295, 300 (2d Cir.) ("The Vienna Convention entered into force April 24, 1964. One hundred and thirteen member states have ratified it, including the United States . . . ."), cert. denied, 510 U.S. 819 (1993).

14

Under the Constitution of Trinidad and Tobago Act 1976, the laws in force before the declaration of independence were preserved and remain in effect as part of the law of the new republic. The 1976 Act Section 5.1 provides in part:

Subject to the provisions of this section, the operation of the existing law on and after the appointed [independence] day shall not be affected by the revocation of the Order in Council of 1962 but the existing laws shall be construed with such modifications, adaptions, qualifications and exceptions as may be necessary to bring them into conformity with the act.

Great Britain's Order in Council of 1962 provided that all laws in effect prior to Trinidad and Tobago's change of status to an independent Dominion of Great Britain would remain in effect. Therefore, the 1935 Order in Council, which specified the United States-Great Britain 1931 extradition treaty was applicable to the British colonies, was incorporated into the law of the independent Trinidad and Tobago nation.

The passage of the Commonwealth and Foreign Territories Act 1985 by the Trinidad and Tobago legislature confirms its intention to assume the privileges and obligations of all extradition treaties Great Britain entered into on its behalf.

The act provides:

Every Order in Council made under the applied United Kingdom Acts entitled the Extradition Acts, 1870 to 1906, with respect to any foreign territory and having effect as part of the law of Trinidad and Tobago immediately before the commencement of this act shall continue to have such effect in relation to that foreign territory, and the Extradition Act and the said applied United Kingdom's Acts shall continue in force in so far as is necessary to give effect to any such Order in Council, until an Order is made under Section 4 applying this Act to that foreign territory.

This statute incorporated the Great Britain treaties, including the 1931 treaty and the 1935 Order in Council, into Trinidad and Tobago law.

Additionally, in 1962, Trinidad and Tobago exchanged diplomatic letters with an emissary of the British government affirming that Trinidad and Tobago assumed the obligations and responsibilities found in the 1931 treaty as well as all other valid international agreements entered into by Great Britain on its behalf. The letter provides in part:

[A]ll obligations and responsibilities of the Government of the
United Kingdom which arise from any valid international
instrument . . . shall henceforth be assumed by the
Government of Trinidad and Tobago, insofar as such
instruments may be held to have application to Trinidad
and Tobago . . . .

United Nations -- Treaty Series no. 6581. Saroop contends these letters do not support the treaty's validity because the United States was not an executor. Nonetheless, the letters illustrate Trinidad and Tobago's adoption of the 1931 treaty into law.

It is also of some consequence that Trinidad and Tobago surrendered Saroop to the United States under a diplomatic request premised on the 1931 extradition treaty. No objection was made. It is evident that Trinidad and Tobago found the request proper under an existing extradition agreement.

For its part, there is ample evidence the United States believes there is an extradition treaty with the independent nation of Trinidad and Tobago. The United States Congress has

16

listed all its bilateral extradition treaties in 18 U.S.C. §
3181.  This includes an extradition treaty with Trinidad and
Tobago signed in 1931 and entered in force in 1935.  Furthermore,
the United States recorded the 1931 extradition treaty in the
U.S. State Department's "Treaties in Force" publication.  See
Office of the Legal Advisor, U.S. Department of State, Treaties
in Force:  A List of Treaties and Other Agreements of the United
States in Force on January 1, 1996.

In the past, the United States State Department,
through its Office of the Legal Advisor, has represented to the
courts that there is a valid extradition treaty between the
United States and Trinidad and Tobago.  Hoi-Pong v. Noriega, 677
F. Supp. 1153, 1155 (S.D. Fla. 1988).  At the time of Saroop's
surrender, the United States which filed its extradition request
under the 1931 treaty clearly recognized the treaty as governing
the extradition.

Finally, there is a presumption that when a colonized
state earns its independence from a colonial nation, prior
treaties recognized by the former colonial power will devolve to
the successor in interest nation.  "Particularly in reference to
emerging nations, the weight of authority supports the view that
new nations inherit the treaty obligations of the former
colonies."  Jhirad v. Ferrandina, 355 F. Supp. 1155, 1159
(S.D.N.Y. 1973), rev'd on other grounds, 486 F.2d 442 (2d Cir.
1973) (extradition treaty entered into between the United States
and Great Britain is valid as to India, even though India had
gained its independence from Great Britain); see also

17

<u>Arnbjornsdottir–Mendler v. United States</u>, 721 F.2d 679 (9th Cir. 1983) (The United States–Denmark extradition treaty applied to Iceland after it became an independent nation).  Moreover, the Vienna Convention acknowledged a presumption that successor nations adopt the bilateral treaty agreements which their formerly affiliated countries entered into on their behalf.[10]

**V.**

Therefore, based on either the international principle of comity or the nations' conduct and intent, we agree with the district court there was a valid binding extradition treaty.

For the foregoing reasons we will affirm the judgment of the district court.

---

10.  Article 24 of the Vienna Convention provides:

(1) A bilateral treaty which at the date of a succession of States was in force in respect of the territory to which the succession of States relates is considered as being in force between a newly independent State and the other State party when:
(a) they expressly so agree; or
(b) by reason of their conduct they are to be considered as having so agreed.

(2) A treaty considered as being in force under paragraph 1 applies in the relations between the newly independent State and the other State Party from the date of succession of States, unless a different intention appears from their agreement or is otherwise established.

United Nations Convention on the Succession of States in Respect of Treaties, (Article 24) Vienna, Austria, August 23, 1978.