

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-3-2006

# Hoxha v. Levi

Precedential or Non-Precedential: Precedential

Docket No. 05-3149

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Hoxha v. Levi" (2006). *2006 Decisions*. Paper 263.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/263

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3149

———

KRENAR HOXHA,

Appellant,

v.

TROY LEVI, WARDEN OF
PHILADELPHIA FEDERAL DETENTION CENTER

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-cv-01211)
District Judge: Honorable Berle M. Schiller

———

Argued June 1, 2006

Before: AMBRO, FUENTES, and GREENBERG, Circuit
Judges.

(Filed: October 3, 2006)

Thomas P. Pfender (ARGUED)
7137 Torresdale Avenue
Philadelphia, PA 19135

ATTORNEY FOR APPELLANT

Paul Mansfield
Assistant United States Attorney
Robert A. Zauzmer
Assistant United States Attorney
Chief of Appeals
Patrick L. Meehan
United States Attorney
Office of the United States Attorney
615 Chestnut Street
Philadelphia, PA 19106

Douglas N. Letter (ARGUED)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Room 7513
Washington, DC 20530

ATTORNEYS FOR APPELLEE

———

OPINION OF THE COURT

———

FUENTES, <u>Circuit Judge</u>.

The Republic of Albania seeks extradition of Krenar Hoxha for the murders of three Albania citizens that took place in Albania in 1996. Following a finding by a Magistrate Judge that he was extraditable, Hoxha filed a petition for habeas corpus that was denied by the District Court. On appeal, Hoxha argues that he is entitled to habeas relief because (1) the Magistrate Judge should have allowed testimony at the extradition hearing by recanting witnesses, (2) the extradition treaty between Albania and the United States is invalid, and (3) he should not be returned to Albania because he will face torture and possible death there. We conclude that Hoxha's claims do not justify a grant of his habeas petition, and we therefore affirm the judgment of the District Court.

2

# I. BACKGROUND

Krenar Hoxha ("Petitioner") was born in Albania in 1970 and became a naturalized United States citizen in January 2002.[1] Pursuant to an extradition treaty between Albania and the United States, the Albanian government seeks Petitioner's extradition for trial on the murders of Ilmi and Roza Kasemi and their son Eltion Kasemi.

Matilda Kasemi, the Kasemis' ten year-old daughter, described the murders in a statement to the police made shortly after the murders occurred. She stated that at about 2 a.m. on September 27, 1996, a man wearing all black, whom Matilda did not recognize, entered the room in which Matilda, her brother, and her parents were sleeping. When Roza Kasemi asked the intruder's name, he immediately shot her without responding. He then shot both Ilmi and Eltion Kasemi, but left without noticing Matilda. Matilda stated that she would recognize the killer if she saw him again.

## A. The Case Against Petitioner

The Republic of Albania alleges that in the mid-1970s, decedent Ilmi Kasemi was romantically involved with Mimoza Hoxha, Petitioner's sister, but the two were forbidden from marrying by Petitioner's parents. A declaration from Ilmi

---

[1] At the detention hearing before the Magistrate Judge and in his petition for habeas corpus, Petitioner stated that he initially entered the United States in June 1996. At oral argument, however, Petitioner's counsel stated that Petitioner came to the United States in 1995. This discrepancy is not relevant to our decision here. Petitioner's counsel also stated at oral argument that Petitioner was in Albania at the time of the murders because he had to attend a wedding.

Kasemi's brother, Murat Kasemi, supports this assertion.[2] Both Ilmi Kasemi and Mimoza Hoxha married others and raised families but, according to the Albanian government, the two renewed an extramarital relationship of which Petitioner strongly disapproved. The Albanian government alleges that Petitioner's anger at Ilmi Kazemi was the motive for the murders, but provided no documentary evidence of a continuing relationship between Kasemi and Mimoza Hoxha.[3] The Albanian government did, however, submit evidence of animosity between Petitioner and Ilmi Kasemi. Specifically, Rahman Sheqeri, a friend and former co-worker of Kasemi, stated in a declaration that on the evening of September 12, 1996, fifteen days before the murders, he saw Petitioner standing with another man about fifty meters from the Kasemi house, holding a gun. Petitioner looked very agitated and, when he saw Sheqeri, told him to go away. Sheqeri reported this incident to Ilmi Kasemi, and Kasemi told Sheqeri that he was sure that Petitioner had been looking for Kasemi that evening. Kasemi also told Sheqeri that Petitioner had assaulted Kasemi on an earlier occasion.

The Albanian government submitted three declarations—from Daut Hoxha, a cousin of Petitioner, and from Daut Hoxha's wife and sister—containing testimony that both parties agree has now been recanted. In his recanted declaration, Daut Hoxha stated that on the night of the murders, Petitioner came to Daut Hoxha's house carrying an automatic weapon inside a plastic bag.[4] Petitioner left the gun in the bag at Daut Hoxha's house,

_____

[2] Unless otherwise indicated, declarations described here were submitted to the Magistrate Judge by the Republic of Albania in support of extradition.

[3] Petitioner states that Mimoza Hoxha is prepared to testify that she did not have an ongoing extramarital affair with Ilmi Kasemi.

[4] All of the witness statements submitted by the Albanian government are dated less than a week after the murders. Petitioner asserts, however, that at least some of the statements were made later. He states, for example, that Daut Hoxha was imprisoned for almost two months and beaten severely before he

and then returned for it at about 5 a.m., intending to throw it in the river. Instead, Daut Hoxha and Petitioner went to the home of Fetah Hoxha, a relative, where Daut Hoxha hid the gun in a sofa. Based on this testimony from Daut Hoxha, the Albanian police searched Fetah Hoxha's home two days after the murders and found a gun in a blue bag hidden in a sofa. A ballistics examination demonstrated that the gun was the weapon used in the murders.

Daut Hoxha's wife, Bajame Hoxha, stated in her recanted declaration that sometime after midnight on the night of the murders, Petitioner knocked on the door of their home and Daut Hoxha let him in. Bajame Hoxha did not hear what was said, but noted that Petitioner did not stay long. In the morning, at about 7 a.m., Bajame Hoxha saw Petitioner in the house again, and she also saw a large empty black plastic bag in a corner of the house. At about 8 a.m., Bajame Hoxha woke up her husband, and he went to work.

Daut Hoxha's sister, Ardjana Hoxha, who lived with her brother at the time of the murders, stated in her recanted declaration that at about 6:30 a.m. on the morning after the murders, she heard her brother asking Petitioner "what did you do?" and heard Petitioner answering "nothing, nothing, you will learn later."

In a declaration that has not been recanted, Fetah Hoxha stated that Daut Hoxha generally "comes in my house as in his house," and that he came to Fetah Hoxha's house at 7 a.m. on the morning after the murders.[5] Fetah Hoxha stated that he did not notice what Daut Hoxha did in the house that day, but that he did not stay long.

made his statement.

[5] The translation of Fetah Hoxha's affidavit states that Daut Hoxha arrived at his house at 7 p.m. rather than 7 a.m. This is probably an error, however, as the original document refers to 0700, which is 7 a.m. according to the European custom.

Attached to his petition for habeas corpus, Petitioner filed new declarations from Daut, Bajame, and Ardjana Hoxha, dated February 15, 2005, averring that their earlier statements were the false product of torture and threats by the Albanian police. Daut Hoxha accounted for his knowledge of the gun's location by stating that, on the night of the murders, "a resident of the area, whose identity I cannot reveal in public, known to me as a criminal of the area," asked him to hide an automatic weapon. Daut Hoxha agreed to do so out of fear.[6] Petitioner asserts that Daut Hoxha was prepared to testify by telephone as to these points at the extradition hearing, and that the other recanting witnesses were willing to testify as well.

## B. Procedural History

In February 1999, Petitioner was tried and convicted for the murders in absentia in Albania. He was sentenced to life imprisonment, but the case was later remanded for retrial by an appellate court, based on a finding that Petitioner did not receive notice of the aggravated circumstance in his charge. Petitioner was again convicted of the murders, and, in November 2000, he was resentenced to 14 years and 8 months in prison. Several appeals followed, and in June 2004 the case was again remanded for retrial based on the finding that, because Petitioner was tried in absentia without notice, he "was denied the constitutional right to be called and to attend the proceedings." Following that ruling, Petitioner has not yet been retried.

In November 2004, the United States filed a complaint for extradition on behalf of the Albanian government, and Petitioner was arrested in the Eastern District of Pennsylvania pursuant to an arrest warrant. In support of extradition, the Albanian government submitted Matilda Kasemi's statement and a series of court papers documenting the passage of Petitioner's case through the Albanian legal system. An extradition hearing was

---

[6] At the extradition hearing, Petitioner's counsel stated that the man who asked Daut Hoxha to hide the gun was Marcel Chello, who was "wanted by Interpol" and "was subsequently murdered."

initiated before a magistrate judge in January 2005. The Magistrate Judge found that the extradition treaty between Albania and the United States was valid, but expressed concern over the lack of sworn documents provided by the Albanian government in support of probable cause. The Magistrate Judge offered the Albanian government two weeks to gather additional documentation. When the extradition hearing reconvened in February 2005, the Magistrate Judge reviewed Albania's additional submission, which contained an affidavit from an Albanian prosecutor with attached photographs, reports, and declarations, including the declarations of Daut Hoxha, Ardjana Hoxha, Bejame Hoxha, Rahman Sheqeri, and Fetah Hoxha described above.

At the hearing, the United States argued that Daut Hoxha's declaration was relevant to probable cause despite his later recantation because the declaration was corroborated by the gun found in Fetah Hoxha's sofa and by Fetah Hoxha's statement that Daut Hoxha came to his house on the morning after the murders.[7] Although the Magistrate Judge initially stated that he would not consider Daut Hoxha's declaration due to the recantation, he later appeared to adopt the government's view, holding that he could consider the declaration to the extent that it was independently corroborated. Without permitting Petitioner to introduce telephonic testimony from the recanting witnesses, the Magistrate Judge concluded that the Albanian government's submission was sufficient to satisfy probable cause. The Judge therefore issued a Certificate of Extraditability and Order of Commitment providing that Petitioner be committed to the United States Marshal pending final disposition of his case by the Secretary of State.

In March 2005, Petitioner filed a habeas corpus petition in United States District Court for the Eastern District of Pennsylvania, arguing (1) that the Magistrate Judge erroneously

---

[7] Although the formal written statements of recantation submitted with the habeas corpus petition were not available to the Magistrate Judge, Petitioner orally informed the Judge of the recantations at the extradition hearing.

denied Petitioner the opportunity to present telephonic testimony from the recanting witnesses in order to demonstrate a lack of probable cause; (2) that the extradition treaty between the United States and Albania was invalid; and (3) that Petitioner would face torture and possible death if extradited to Albania. The District Court denied the petition in May 2005. The District Court held that, although the case against Petitioner was "riddled with holes" under a reasonable doubt analysis, the very low standard for probable cause was satisfied even without the recanted testimony and the telephonic testimony was therefore irrelevant. The District Court also held that the extradition treaty between the United States and Albania was in full force and effect and that Petitioner's humanitarian claims could be considered only by the Secretary of State. Petitioner now appeals.

## II. DISCUSSION

Extradition is an executive rather than a judicial function. Sidali v. INS, 107 F.3d 191, 194 (3d Cir. 1997). For this reason, a court may conduct only a limited inquiry following a complaint seeking extradition. Id. In an extradition hearing, the court decides whether the defendant is subject to surrender to the requesting government, a determination that requires a finding as to whether probable cause supports the charges against the defendant. Id. at 194-95; see also 18 U.S.C. § 3184 (stating that upon a complaint for extradition, a court may consider whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention"). If probable cause is satisfied, the judge makes a finding of extraditability, and the case is certified to the Secretary of State for further action. Sidali, 107 F.3d at 195.

An individual challenging a court's extradition order may not appeal directly, because the order does not constitute a final decision under 28 U.S.C. § 1291, but may petition for a writ of habeas corpus. Sidali, 107 F.3d at 195. On habeas, a reviewing court may consider only "'whether the magistrate [judge] had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable

8

ground to believe the accused guilty.'" Id. (quoting Fernandez v. Phillips, 268 U.S. 311, 312 (1925)). Here, Petitioner does not argue that the Magistrate Judge lacked jurisdiction, nor does he contest that murder is within the scope of the Albania-United States extradition treaty.[8] Petitioner does, however, challenge the Magistrate's finding of probable cause, and also contends that the extradition treaty is no longer in force.[9]

## A. Probable Cause Determination

Petitioner argues that the Magistrate Judge erred in excluding telephonic testimony from the witnesses who recanted their statements, and that the Judge's probable cause finding must be reversed on this basis. We review a magistrate judge's decision to admit or exclude evidence in an extradition proceeding for abuse of discretion. See In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986). In addition, we uphold the judge's finding of probable cause "if there is any competent evidence in the record to support it." Sidali, 107 F.3d at 199.

In considering whether the Magistrate Judge should have allowed introduction of the testimony of the recanting witnesses, we focus on whether this evidence could have affected the probable cause analysis. The probable cause standard applicable

---

[8] Under the terms of the extradition treaty, Albania and the United States have agreed, "upon requisition duly made," to "deliver up to justice any person who may be charged with, or may have been convicted of, any of the crimes or offenses specified in Article II of the present treaty." Murder is one of the crimes listed in Article II.

[9] The Magistrate Judge had jurisdiction over the government's extradition request pursuant to 18 U.S.C. § 3184, and the District Court had jurisdiction over this habeas petition pursuant to 28 U.S.C. § 2241. We have jurisdiction under 28 U.S.C. § 2253, which provides that a final order in a habeas proceeding is subject to review by the court of appeals for the circuit in which the proceeding occurs.

to an extradition hearing is the same as the standard used in federal preliminary hearings. Id. Thus, the magistrate's role is "to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Id. (internal quotation marks omitted). A judge may rely on hearsay evidence in considering whether probable cause is satisfied. In re A.M., 34 F.3d 153, 161 (3d Cir. 1994).

The range of evidence that a defendant may introduce as to probable cause at an extradition hearing is limited. Courts have traditionally distinguished between inadmissible "contradictory evidence," which merely conflicts with the government's evidence, and admissible "explanatory evidence," which entirely eliminates probable cause. See, e.g., Barapind v. Enomoto, 360 F.3d 1061, 1069 (9th Cir. 2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir. 1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted). In practice, this line is not easily drawn, but the rule serves the useful purpose of allowing the defendant "to present reasonably clear-cut proof . . . of limited scope [that has] some reasonable chance of negating a showing of probable cause," while preventing the extradition proceedings from becoming "a dress rehearsal trial." Koskotas, 931 F.2d at 175 (internal quotation marks omitted).

One circuit court has suggested that a recantation of inculpatory evidence does not constitute admissible explanatory evidence in an extradition hearing. See Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir. 1981) (refusing to admit such evidence because it "do[es] not explain the government's evidence, rather [it] tend[s] to contradict or challenge the credibility of the facts implicating petitioner"). Several district courts have found recantation evidence to be admissible, however. See, e.g., In re Extradition of Contreras, 800 F. Supp. 1462, 1465 (S.D. Tex.

10

1992) ("[I]t is obvious to this Court that if the only evidence of probable cause were the confessions, and if sufficiently recanted, then the existence of probable cause would be negated."); Republic of France v. Moghadam, 617 F. Supp. 777, 783 (N.D. Cal. 1985) (distinguishing Eain and holding that recantation was admissible in an extradition hearing because recantation had more indicia of reliability than original testimony, and therefore negated probable cause).

We need not decide whether a recantation of inculpatory testimony may ever be admitted in an extradition proceeding, because we find that the Magistrate Judge here did not abuse his discretion in finding the recantations inadmissible. Although the initial declarations of Daut, Bejame, and Ardjana Hoxha were important to the government's showing of probable cause, we believe that the recantation of those declarations did not negate probable cause. Daut Hoxha's original declaration was independently corroborated by the evidence that the weapon used in the murders was found in Fetah Hoxha's sofa and that Fetah Hoxha saw Daut Hoxha in his house on the day of the murder. Nor did Daut Hoxha's later retelling of the night's events obliterate probable cause; instead, it provided an alternative and contradictory narrative that can properly be presented at trial. Sheqeri's statement that Petitioner had been seen near the Kozemi home with a gun two weeks before the murder provided additional evidence suggesting Petitioner's guilt. The Magistrate Judge therefore did not abuse his discretion in excluding the recantation evidence. There was competent evidence to support the Magistrate Judge's finding of probable cause, and we therefore decline to grant habeas relief on this basis.[10]

---

[10] Petitioner also argues that the witness statements do not support probable cause because they contain certain inconsistencies as to timing. Specifically, Daut Hoxha stated that Petitioner came to his house a second time at about 5 a.m.; Bajame Hoxha saw Petitioner alone in the house at about 7 a.m., and says that she woke up Daut at 8 a.m.; Ardjana Hoxha saw Daut and Petitioner speaking in the house at about 6:30 a.m.; Fetah Hoxha saw Daut at his house at about 7 a.m. These minor

11

## B. Validity of the Extradition Treaty

For an extradition to proceed, there must be a valid extradition treaty between the requesting country and the United States. See Sidali, 107 F.3d at 194. A petitioner facing extradition has standing to challenge the validity of the applicable extradition treaty. United States ex rel. Saroop v. Garcia, 109 F.3d 165, 168 (3d Cir. 1997). Petitioner here argues that the extradition treaty between Albania and the United States is invalid because the Kingdom of Albania, which was the signatory to the treaty in 1933, no longer exists, and in 1944 the successor government rejected all treaties entered into by the Kingdom of Albania. We review de novo the District Court's legal conclusion that the extradition treaty is currently in force. See id. at 167.

Whether a treaty remains valid following a change in the status of one of the signatories is a political question, and we therefore defer to the views of each nation's executive branch. Id. at 171. The intent and conduct of the relevant governments is the critical factor. Id.; see also Terlinden v. Ames, 184 U.S. 270, 285 (1902) ("[O]n the question whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance.").

The U.S. government recognizes the extradition treaty between Albania and the United States as valid. A declaration submitted in this litigation from an Attorney Adviser in the Office of the Legal Adviser for the State Department states that the extradition treaty is "in full force and effect." A second submitted declaration from an Assistant Legal Adviser for Treaty Affairs in the Office of the Legal Advisor for the State Department confirms that view, and also notes that the treaty is named in the State Department's January 2004 "Treaties in Force" list, which includes treaties that have not expired and have not been otherwise terminated. See Saroop, 109 F.3d at 172 (noting, in considering the validity of an extradition treaty, that

---

variations do not negate probable cause; instead, they present credibility issues that should be addressed at trial.

"the United States recorded the . . . treaty in the U.S. State Department's 'Treaties in Force' publication").

The Albanian government also recognizes the validity of the extradition treaty, as demonstrated by the fact that Albania requested Petitioner's extradition in this case pursuant to that treaty. Moreover, in 2003, the Albanian government ordered extradition of an individual on a charge of attempted homicide in response to a request from the United States under the extradition treaty.[11] See Saroop, 109 F.3d at 172 (finding indicative of Trinidad and Tobago's recognition of the relevant treaty that Trinidad and Tobago "surrendered Saroop to the United States under a diplomatic request premised on the [treaty]"). Based on this evidence, we conclude that the extradition treaty between Albania and the United States remains valid, and we deny the habeas petition as to this claim.[12]

## C. Risk of Torture and Death Upon Extradition

Lastly, Petitioner asserts that he should be granted habeas relief because he will be tortured and may be killed by the Albanian authorities if he is extradited.[13] Under the traditional

---

[11] In that case, the Albanian High Court explicitly rejected a claim that the extradition treaty between the United States and Albania was invalid.

[12] Petitioner also argues that the Magistrate Judge erred in denying Petitioner's request to provide evidence from a legal expert who would have testified about the history of the extradition treaty. Given that the critical factor in determining treaty validity is the intent of the participating governments and that both Albania and the United States recognize the validity of the treaty, the testimony of the expert was not relevant. The Magistrate Judge's ruling therefore was not an abuse of discretion.

[13] The "torture" Hoxha fears is being beaten and tortured as a police suspect and as a prisoner. As the District Court noted, "[t]he U.S. State Department is aware that Albanian police have beaten and tortured suspects and that prison conditions in

13

doctrine of "non-inquiry," such humanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable. See, e.g., Sidali, 107 F.3d at 195 n.7 ("[W]e note that it is the function of the Secretary of State—not the courts—to determine whether extradition should be denied on humanitarian grounds."); United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country.") (internal quotation marks and citation omitted). The non-inquiry principle serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request. See Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir. 1990); Prasoprat v. Benov, 421 F.3d 1009, 1016 (9th Cir. 2005). Once an individual is certified by a court as extraditable, the Secretary of State "exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations" in deciding whether extradition is appropriate. Sidali, 107 F.3d at 195 n.7; see also Kin-Hong, 110 F.3d at 109-110 (noting that "[t]he Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian

_____

Albania are poor." Hoxha v. Levi, 371 F. Supp. 2d 651, 660 n.3 (E.D. Pa. 2005) (citing U.S. Dep't of State, Country Report on Human Rights Practices in Albania – 2004 (Feb. 28, 2005)). The District Court went on to articulate its own concerns that Hoxha would be subject to these abuses and strongly encouraged the State Department to "seriously examine the charges of torture that Hoxha has levied against Albanian authorities and faithfully uphold[] this Government's clear policy of refusing to extradite a person when there are substantial grounds for believing the person would be subject to torture." Id. We echo the Court's concerns and urge the State Department to consider seriously Hoxha's allegations, particularly in light of the declarations from Daut, Bajame, and Ardjana Hoxha averring that their initial statements were the product of torture by the Albanian police.

14

and foreign policy considerations," and "may also elect to use diplomatic methods to obtain fair treatment for the relator"). Under the principle of non-inquiry, and in view of the evidence before it, the District Court correctly declined to consider Petitioner's humanitarian claims in the context of the extraditability analysis.[14]

Petitioner nonetheless argues that his humanitarian arguments are relevant under Section 2422 of the Foreign Affairs Reform and Restructuring Act ("FARR"), Pub. L. No. 105-277, 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), which implemented Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Torture Convention").[15] Section 2422(a) of FARR provides:

---

[14] In Gallina v. Fraser, 278 F.2d 77 (2d Cir. 1960), the Second Circuit suggested in dicta that an exception to the non-inquiry principle might exist in particularly extreme cases. Id. at 79 ("We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination" of the non-inquiry principle.). Since Gallina, several courts have hinted at the existence of such an exception. See, e.g., Mainero v. Gregg, 164 F.3d 1199, 1210 (9th Cir. 1999) (assuming possibility of Gallina exception but finding it inapplicable in the case presented); Kin-Hong, 110 F.3d at 112 (same). But see Martin v. Warden, Atlanta Pen, 993 F.2d 824, 830 n.10 (11th Cir. 1993) (rejecting Gallina dicta). The exception remains theoretical, however, because no federal court has applied it to grant habeas relief in an extradition case. Regardless of whether such an exception might be justified in some circumstances, we find that it does not apply here.

[15] The United States has ratified the Torture Convention. See Auguste v. Ridge, 395 F.3d 123, 130-32 (3d Cir. 2005). The Convention is not self-executing, however, and therefore does not in itself create judicially enforceable rights. Id. at 132 & n.7 ("Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by

> It shall be the policy of the United States not to
> expel, extradite, or otherwise effect the involuntary
> return of any person to a country in which there are
> substantial grounds for believing the person would
> be in danger of being subjected to torture,
> regardless of whether the person is physically
> present in the United States.

This policy is to be enforced by the heads of "the appropriate agencies"—here, the Department of State—who "shall prescribe regulations to implement the obligations of the United States under Article 3" of the Torture Convention. Section 2242(b). FARR also provides that

> nothing in this section shall be construed as
> providing any court jurisdiction to consider or
> review claims raised under the [Torture]
> Convention or this section, or any other
> determination made with respect to the application
> of the policy set forth in subsection (a), except as
> part of the review of a final order of removal
> pursuant to section 242 of the Immigration and
> Nationality Act . . . .

Section 2242(d). Although this provision makes clear that FARR does not <u>create</u> court jurisdiction, Petitioner contends that the Secretary of State's enforcement of FARR is reviewable by the federal courts under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706 (2000). The APA provides that court review is available as to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In response, the government argues that court review is unavailable because FARR did not abrogate the principle of non-inquiry, and that principle precludes review of the Secretary's actions.[16] This

---

implementing legislation.").

[16] The Ninth Circuit discussed this issue in a series of cases beginning in 2000. In <u>Cornejo-Barreto v. Seifert</u>, 218 F.3d

16

debate is premature. The APA provides for review of "final agency action," but the Secretary of State has yet to take any action on Petitioner's case, and may ultimately decide not to extradite Petitioner. Thus, Petitioner's claim under the APA is not ripe for review, and we decline to consider it at this time. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted).

Although the United States recognizes that Petitioner's

---

1004 (9th Cir. 2000) ("Cornejo-Barreto I"), the Ninth Circuit held that, under FARR and the APA, "a fugitive fearing torture may petition [through habeas corpus] for review of the Secretary's decision to surrender him" following a court certification of extraditability. Id. at 1014-15. Because the Secretary had not yet made an extradition decision in the case, the Court affirmed the denial of habeas relief without prejudice to a new filing should the Secretary decide to extradite the petitioner. Id. at 1016-17.

After the Secretary made the decision to extradite, the petitioner filed a second habeas petition, based on Cornejo-Barreto I. On appeal, the Ninth Circuit held that the conclusion in Cornejo-Barreto I as to the availability of APA review was non-binding dicta, because the Secretary had not yet made a decision to extradite when that case was decided. Cornejo-Barreto v. Siefert, 379 F.3d 1075, 1082 (9th Cir. 2004) ("Cornejo-Barreto II"). Considering the issue anew, the Court concluded that, under the doctrine of non-inquiry, the Secretary's decision to extradite was not subject to judicial review, and FARR and the APA did nothing to change this result. Id. at 1087.

The Ninth Circuit granted rehearing en banc in the case, but following the government's decision to withdraw its extradition claim, the case was dismissed as moot. Cornejo-Barreto v. Siefert, 386 F.3d 938 (9th Cir. 2004); Cornejo-Barretto v. Siefert, 389 F.3d 1307 (9th Cir. 2004). As a result, neither Cornejo-Barreto I nor Cornejo-Barreto II is binding precedent in the Ninth Circuit.

17

claim under the APA is not ripe, it urges us to resolve the claim nonetheless, arguing that leaving open the possibility of a second round of court review in extradition proceedings disrupts extradition law and interferes with the Executive Branch's ability to fulfill its duties. This argument is unconvincing. Our refusal to address Petitioner's APA claim leaves this area of extradition law unchanged, and does not inject any new uncertainty into extradition proceedings. Moreover, the ripeness doctrine clearly precludes us from resolving questions that will have practical relevance to the parties only if a contingent event occurs at some future time. See Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands, 385 F.3d 801, 806 (3d Cir. 2004) (noting that a case "ripe for judicial intervention . . . cannot be 'nebulous or contingent' but 'must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them'") (quoting Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 244 (1952)). Nothing in our jurisprudence suggests that we abandon that principle here.

Based on the foregoing analysis, we affirm the District Court's finding that Petitioner's humanitarian arguments in this case are irrelevant to the certification decision. We do not address Petitioner's additional assertion that, should the Secretary of State decide to extradite Petitioner, we would have jurisdiction to review that decision under the APA.

### III. CONCLUSION

For the reasons stated above, we affirm the District Court's denial of Hoxha's petition for a writ of habeas corpus.

18